UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS LLP
One North Broadway, Suite 1502
White Plains, New York 10601
(914) 328-0404
Joseph A. Saccomano, Jr. (JS 7504)

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York  10038
Nicole Quick Saldana (NS 6524)

-------------------------------------------------------x
DEBRA CHAMBERS-ENGLISH,                :
                                       :
            Plaintiff,                 :    Civ. No: 05-2976 (DC)
                                       :
     -against-                         :
                                       :
UNISYS CORPORATION,                    :
                                       :
            Defendant.                 :
-------------------------------------------------------x

# DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Defendant Unisys Corporation (referred to herein as "Unisys" or "Defendant"), by and through its attorneys, Jackson Lewis LLP, respectfully submits this Statement of Material Facts pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York in support of its Motion for Summary Judgment.

# STATEMENT OF MATERIAL FACTS[1]

**A.   Background About Defendant Business And Relevant Employment Policies.**

1.   Unisys is a worldwide technology services and solutions company. Unisys consultants apply its expertise in consulting, systems integration, outsourcing, infrastructure, and server technology to help its clients achieve secure business operations. *KN Aff.* ¶4.

2.   Unisys promotes equal employment opportunity within the workplace, and has a strict policy prohibiting discrimination on the basis of race, color, religion, creed, sex, age, national origin, ancestry or any other status protected by state or federal law.[2] *JS Aff. Ex.* 6. Unisys employees are encouraged through its Speak Out policy to resolve workplace concerns involving complaints of discrimination or unfair treatment.[3] *JS Aff. Ex.* 7.

3.   Unisys has a diversity awareness course for its managers to ensure sensitivity to, and awareness of, issues of employee diversity.[4] *JS Aff. Ex. 8*. In addition, all employees are required to attend ethics training on an annual basis.[5] *JS Aff. Ex. 9*.

4.   At all relevant times, Unisys was organized into four business units: Systems and Technology, Global Infrastructure Services, Global Outsourcing, and Enterprise Transformation Services. *KN Aff.* ¶5.

---

[1]   These facts are largely undisputed and to the extent they are disputed they are set forth in the light most favorable to the Plaintiff. The facts are based, in part, on the and depositions taken in this matter and shall be cited to herein as follows: deposition of Plaintiff Debra Chambers English ("Pl. Dep., p. __"), deposition of Jim McKenna ("JM Dep., p. __"), deposition of Armando Campea ("AC Dep., p. __"), deposition of Jacqueline Walpole ("JW Dep., p. __"), deposition of Robert Napolitano ("RN Dep., p. __"). Copies of the pages to the depositions cited to herein are attached to the Affidavit of Joseph A. Saccomano, Jr. dated August 24, 2006 ("JS Aff.") as Exhibits "1," "2," "3," "4," and " 5," respectively. Additional facts are based upon the affidavit of Keith Noble ("KN Aff. ¶ __), affidavit of Armando Campea ("AC Aff. ¶ __), affidavit of Alan Schwartz ("AS Aff. ¶ __) and affidavit of James McKenna ("JM Aff. ¶ __).

[2]   A copy of Unisys's EEOC policy is attached to the JS Aff. as Exhibit 6.

[3]   A copy of Unisys's Speak Out policy is attached to the JS Aff. as Exhibit 7.

[4]   A copy of Unisys's Diversity policy is attached to the JS Aff. as Exhibit 8.

[5]   A copy of Unisys's Code of Ethics and Business Conduct policy is attached to the JS Aff. as Exhibit 9.

B.     **Background About Plaintiff's Employment with Unisys.**

5.     Plaintiff began her employment with Unisys on December 28, 1998 as a Consultant with the Network Desktop Consulting Practice (commonly known as "The Practice"), which was part of the Global Infrastructure Services business unit.[6] *Pl. Dep., p. 52-3; JS Aff. Ex. 10.* Her starting salary was $70,008 per year. *Id.*

6.     As a member of The Practice, Plaintiff helped design and sell Unisys products and support to meet the needs of Unisys' clients. *Pl. Dep., p. 53-7.*

7.     On October 1, 2000, Plaintiff was promoted to the position of Integration Architect. Her salary was increased to $90,050. *Pl. Dep., p. 60; JS Aff. Ex. 10.*

8.     One of the projects Plaintiff worked on in The Practice was the response to a Request for Proposal from the Port Authority of New York and New Jersey ("the Port Authority"). *Pl. Dep., p. 60.*

9.     In August 2000, Unisys was awarded the contract with the Port Authority. *AK Aff. ¶ 7.*

10.    As a client of Unisys' Global Infrastructure Services ("GIS") business unit, the Port Authority was set up with a Project Management Office ("PMO") to manage the account, the service delivery team, contract changes, continuous service improvements, and reporting and finance functions. *AC Aff. ¶ 5; AK Aff. ¶ 9.*

11.    Because of a lull in business demand at the time, members of The Practice were assigned to the Project Authority account to assist with setting up the operation team which provided IT support for the Port Authority's workforce. *Pl. Dep., p. 72; AK Aff. ¶ 8.*

12.    The contracted services included a help desk and an on-site team to support the Port Authority's servers and databases. *AC Aff. ¶ 6.*

---

[6]    Relevant portions of Plaintiff's Employee Transaction History Detail are attached to the JS Aff. as Exhibit 10.

13. In addition to members of The Practice, the transition team consisted of contractors with diverse technical skills, including abilities to handle issues related to desktop computers, servers, databases, and distributed systems. *Pl. Dep., p. 60-61; AK Aff. ¶ 10.*

14. Unisys' goal was to establish a permanent PMO for the account consisting primarily of regular Unisys employees fully dedicated to the Port Authority project, as opposed to a mix of contractors and "borrowed" employees from The Practice. *AC Aff. ¶ 9; AK Aff. ¶ 12.*

15. Unisys therefore hired some of the contractors with the intention of converting them to regular Unisys employees depending on the business needs of the Port Authority.[7] *JS Aff. Ex. 11; AC Aff. ¶ 11; AK Aff. ¶ 13.*

16. All employees and contractors were expected to cooperate and assist in other areas as needed. *AC Aff. ¶ 10; JM Aff. ¶11; AK Aff. ¶ 17.*

17. At pertinent times, the team consisted of Armando Campea – Program Manager, James McKenna – Program Business Manager, Alan Schwartz – Systems Administration Manager, Debra Chambers-English – Documentation Coordinator, Jacqueline Walpole – Quality Assurance Manager, Maureen (Cunningham) Brown – Administrative Assistant, and eventually Robb Napolitano – Service Delivery Project Management Manager 2.[8] *AC Aff. ¶ 12; JS Aff. Ex. 12.*

18. Mr. Campea's direct reports were Merrs. Schwartz and McKenna. Mr. Campea reported to the Regional Account Director, Terri Kovalski. *AC Aff. ¶ 14.*

---

[7] A copy of the Port Authority Re-mapping presentation dated May 18, 2001 is attached to the JS Aff. as Exhibit 11.

[8] A list of employees and contractors assigned to the Port Authority account is attached to the JS Aff. as Exhibit 12. Mr. Campea, Mr. McKenna, Mr. Schwartz, Ms. Walpole, and Mr. Napolitano are Caucasian. Ms. Chambers-English and Ms. Brown are African American. *AC Aff. ¶ 13.*

19. The positions of Quality Assurance Manager and Documentation Coordinator, among other positions, were budgeted positions established in the RFP for the Port Authority account. *AC Aff. ¶ 15; JS Aff. Ex. 11*.

20. These positions reported to the Program Business Manager. *AC Aff. ¶ 15*.

21. Each position with Unisys is assigned a role, role code and Market Reference Point (MRP).[9] *JS Aff. Ex. 13*.

22. In the first quarter of 2001, Unisys' HR department began developing a conversion plan which established appropriate role, role code and MRP for the permanent positions within the Port Authority account. *Id.*; *JS Aff. Ex. 11*.

C. **Facts Relating to Plaintiff's Voluntary Transfer to the Port Authority Account.**

23. In August 2001, Mr. Campea and Plaintiff had a discussion about Plaintiff transferring from The Practice to the Port Authority account. *Pl. Dep., p. 76-77*.

24. At the time, there was a decrease in business for The Practice and consideration of the Practice being eliminated entirely. *Pl. Dep., p. 72, 259*.

25. At that time, the only position available in the PMO of the Port Authority account was Documentation Coordinator. *AC Dep., p. 15; AC Aff. ¶ 17*.

26. Mr. Campea advised Plaintiff that because the Documentation Coordinator position had a lower MRP than her position as Integration Architect, she would be ineligible for salary increases under the salary guidelines. *Pl. Dep., p. 79-80; AC Dep., p. 15-16, 23; AC Aff. ¶ 18*.

---

[9] Relevant portions of the 2004 Salary Planning Guide are attached to the JS Aff. as Exhibit 13. The Planning Guide provides that roles are broad in scope and define work in terms of expected contributions and required skills. Unlike conventional job descriptions, which focus on discrete tasks and the differences among the specific responsibilities and duties that people perform, roles emphasize the similarities among the types of work people perform. A role code is a number which represents an internal Unisys title. The MRP represents base pay in the marketplace based on competitive pay data drawn from compensation surveys. *Id.*; *Pl. Dep., p. 68-9*.

27. Mr. Campea consulted with HR and obtained authorization to transfer Plaintiff from the Practice to the Port Authority account at her current salary even though it was over $23,000 more than the MRP for the position. *JS Aff. Ex. 10*; *AC Aff. ¶ 19*.

28. Mr. Campea also told Plaintiff that he would look for promotional opportunities for her. *Pl. Dep., p. 157-58*.

29. Plaintiff discussed the Documentation Coordinator opportunity with William Hartig, her manager at The Practice, and he told Plaintiff that there was a "lull" in business, and it would be a good opportunity for her to be permanently assigned to a project. *Pl. Dep., p. 76*.

30. She also discussed it with another member of The Practice, Alan Schwartz (Mr. Schwartz later joined the Port Authority account), and Mr. Schwartz also told her that work was slow at The Practice, and it would be a good move for her to accept the opportunity at the Port Authority. *Pl. Dep., p. 76 -77; AK Aff. ¶ 14*.

31. Plaintiff voluntarily accepted the Documentation Coordinator position, with full knowledge of its lower role code and MRP, because it offered more stability than her position at The Practice. *Pl. Dep., p. 82*.

32. Plaintiff's transfer from The Practice to the Port Authority account was voluntary. She could have continued to work in The Practice. *Pl. Dep., p. 79*.

33. On September 1, 2001, Plaintiff was officially transferred from The Practice to the PMO of the Port Authority account in the role of a Business Excellence Analyst 1 (with the responsibilities of a "Documentation Coordinator"). *Pl. Dep., p. 73-4; JS Aff. Ex. 10*.

34. As a result of the transfer, Plaintiff's role code and MRP were changed from Integration Architect/W00142 with a MRP of $103,419 to Business Excellence Analyst/W00043 with a MRP of $69,989. *Pl. Dep., p. 81; JS Aff. Ex. 10*.

35. Her salary, however, was not reduced. *Pl. Dep., p. 81-82; JS Aff. Ex. 10*.

36. As a Documentation Coordinator, Plaintiff reported to Mr. McKenna. *AC Aff. ¶ 15; JM Aff. ¶ 6.*

37. On September 11, 2001, ten days after Plaintiff's transfer, the offices of the Port Authority were destroyed as a result of the attacks on the World Trade Center. *Pl. Dep., p. 86; AC Aff. ¶ 20.*

38. Thereafter, the Port Authority changed the focus of the services it wanted from Unisys and Unisys assisted with the rebuilding and restoration of the Port Authority's infrastructure. *Pl. Dep., p. 233; AC Aff. ¶ 20.*

39. Plaintiff's responsibilities included documentation management, process improvement, project management and coordination roles. *Pl. Dep., p. 272, 274-6, 279-81; JM Dep., p. 72; AC Dep., p. 17-18.; JM Aff. ¶ 9.*

40. Plaintiff did not have sole supervisory authority over any employee or contractor. *JM Aff. ¶ 9.*

41. As with other employees and contractors in the PMO, Plaintiff's duties and assignments changed while she worked at the Port Authority. *JW Dep., p. 30-31; AC Aff. ¶ 24; JM Aff. ¶ 10.*

42. At times the changes were motivated by Unisys' contractual obligations to improve the quality, efficiency and costs of the services provided to the Port Authority. *AC Aff. ¶ 23.*

43. An example of this occurred in September 2003, when Mr. Campea announced an organizational change to balance the PMO by making one side accountable for infrastructure and the other accountable for application support and account management services.[10] *JS Aff. Ex.14; AC Aff. ¶ 23.*

---

[10] A copy of Armando Campea's e-mail dated September 10, 2003 regarding an organizational change is attached to the JS Aff. as Exhibit 14.

44. As a result of this reorganization and the business needs of the Port Authority, the responsibilities of Unisys employees and contractors changed during their tenure on the account. *AC Aff. ¶ 24; AK Aff. ¶ 24; JM Aff. ¶43.*

45. Plaintiff was given assignments based on the needs and focus of the account, just as all other employees and contractors, regardless of race. *AC Aff. ¶ 25; JM Aff. ¶ 12.*

46. Each year, Plaintiff's performance was evaluated by her manager, Mr. McKenna. *JM Aff. ¶ 14.*

47. Plaintiff was considered a hard worker and good performer, but she had problems interacting with others and focused on her own individual duties instead of considering the overall needs of the account. *JM Dep., p. 71-2.*

48. During her performance reviews, Plaintiff expressed her dissatisfaction with her compensation. *Pl. Dep., p. 262, 268; JM Aff. ¶ 15.*

49. In response to Plaintiff's concerns, Mr. McKenna reminded Plaintiff that she was ineligible for salary increases because her salary far exceeded the MRP for Documentation Coordinator. *JM Aff. ¶ 16.*

50. Mr. McKenna advised Plaintiff that to advance her career at Unisys she needed to decide whether she wanted to pursue a technical or management track. *JM Dep., p. 64; JM Aff. ¶ 17.*

51. Mr. McKenna also suggested that Plaintiff use the Unisys intranet to seek positions outside the Port Authority account.[11] *Pl. Dep., p. 298-99. JM Aff. ¶ 18; JS Aff. Ex. 15..*

52. Although Plaintiff was aware she could apply for others positions within Unisys, she did not apply for any positions. *Pl. Dep., p. 112.*

---

[11] A copy of the Unisys Internal Selection policy is attached to the JS Aff. as Exhibit 15. It provides that all full or part-time Unisys employees are eligible to apply for positions provided they have been in their current role code for twelve months and have exhibited satisfactory performance within the current role. Management approval is not necessary to apply for an open position. *JS Aff. Ex.15.*

53. In early 2003, during the annual performance review, Plaintiff expressed concern about her role code. *Pl. Dep., p. 268-69; JM Dep. p. 93.*

54. In response to Plaintiff's concerns, Messrs. McKenna and Campea consulted with HR about performing an evaluation of Plaintiff's responsibilities to determine if she was properly classified in her role. *Pl. Dep., p. 268-69; JM Dep. p. 92.*

55. In preparation for the assessment, Plaintiff created a description of her role and responsibilities which was reviewed by Mr. McKenna.[12] *JS Aff. Ex. 16; JM Dep. p. 92.*

56. Plaintiff and Mr. McKenna worked together to revise the document and Mr. McKenna submitted the final description to HR for review. *Id.*

57. Keith Noble, HR Business Partner, reviewed Plaintiff's description and the Unisys role summary.[13] *JS Aff. Ex. 17; JM Dep. p. 93.*

58. The Unisys role summary for the Business Excellence Analyst 1 reads as follows:

> Provide data driven analysis of business processes and help implement improvements in the customer focus, efficiency, accuracy, and effectiveness of these processes. Champion awareness training and implementation of business processes with organizations. Provide expertise in external standards and validations (i.e. ISO 9000). Proficient with a wide range of improvement tolls including statistics. Fully qualified professional with some years working experience. Provides comprehensive services and has technical knowledge to solve complex problems. Understand Unisys business strategy and is able to operate successfully with little supervision. *JS Aff. Ex. 17.*

59. Mr. Noble concluded that Plaintiff was properly assigned as a Business Excellence Analyst 1. *JS Aff. Ex. 17.*

---

[12] Copies of the e-mails between Plaintiff and Mr. McKenna and Plaintiff's role description are attached to the JS Aff. as Exhibit 16.

[13] A copy of Keith Noble's e-mail dated February 4, 2003 is attached to the JS Aff. as Exhibit 17.

60. Mr. Noble also noted that her salary was at 134% of the MRP for her position. *JS Aff. Ex. 17.*

61. In 2004, during Plaintiff's annual performance review, Mr. McKenna again spoke to Plaintiff about her career path at Unisys. *JM Dep., p. 64; JM Aff. 19.*

62. He had previously and repeatedly advised her that she was at a point in her career where she needed to decide whether to pursue a "technical" career path or a "managerial" career path. *JM Aff. 20.*

63. Now Plaintiff, for the first time, indicated she wanted to pursue management opportunities instead of a technical career path. *JM Dep., p. 64; JM Aff. ¶ 21.*

64. Mr. McKenna assisted Plaintiff with her goals by assigning developmental tasks to give her experience to help build her resume to support her new goal of pursuing a management career path. *JM Dep., p. 65; JM Aff. ¶ 22.*

65. One of the assignments Plaintiff was given during this period involved a leading role with the Database and Systems Administration teams. *Pl. Dep., p. 274-75; JM Aff. ¶ 23.*

66. During her mid-year review in 2004, Plaintiff and Mr. McKenna had a discussion about Plaintiff finding another position within Unisys. *Pl. Dep., p. 298-99; JM Dep., p. 64.*

67. Mr. McKenna suggested Plaintiff prepare a resume to be forwarded to his boss's boss, Terri Kovalski, Regional Account Director, so she could circulate the resume for opportunities in other accounts within Unisys.[14] *Pl. Dep., p. 298-9; JM Aff. ¶ 25; JS Aff. Ex. 18.*

68. Mr. McKenna also assisted Plaintiff with the preparation of her resume – an experience Plaintiff describes as pleasant. *Pl. Dep., p. 303.*

---

[14] A copy of e-mails regarding Plaintiff's resume are attached to the JS Aff. as Exhibit 18.

69. As a result of Messrs. Campea and McKenna's efforts, in August 2004, Plaintiff participated in a telephone interview with Russ Romanelli regarding an interest in promoting her out of the Port Authority account and into a Transition Manager position.[15] *Pl. Dep., p. 298-302; JS Aff. Ex. 19.*

70. Despite this promotional opportunity, Plaintiff resigned from Unisys in September 2004 without giving notice. *JM Aff. ¶ 46; AC Aff. ¶ 34.*

### D. Facts Relating to Plaintiff's Claim that She Was Denied Promotions.

71. Plaintiff claims she should have received one of two "promotions" during her tenure on the Port Authority account to either: (1) the Quality Assurance Manager position in 2002; or (2) the Service Delivery Project Manager position in 2004.[16] *Complaint ¶ 3, 18.*

#### 1. The Quality Assurance Manager Position.

72. The position of Quality Assurance Manager was a budgeted position which was established in the original RFP for the Port Authority account. *Pl. Dep., p. 159-60; AC Aff. ¶ 15; JS Aff. Ex. 11.*

73. Jack Eakins, a contractor, was the first person to hold the position of Quality Assurance Manager. *Pl. Dep., p. 115.*

74. Mr. Eakins left the account toward the end of September 2001. *Pl. Dep., p. 158.*

75. In January 2002, Messrs. McKenna and Schwartz began interviewing candidates to fill the Quality Assurance position. *JM Dep., p. 39; AS Aff. ¶ 20.*

76. The focus with respect to the hiring decision was on a quality assurance background and an intent to find the best qualified candidate. *JM Dep., p. 62, 68-69.*

---

[15] A copy of Plaintiff's e-mail dated August 10, 2004 is attached to the JS Aff. as Exhibit 19.

[16] Plaintiff refers to this position as an Extra Work Project Manager in Count V of her Complaint. A copy of Plaintiff's Complaint is attached to the JS Aff. as Exhibit 20.

77. As a result of his search, Mr. McKenna selected Barry Young, a Certified Quality Analyst and former Senior Quality Manager with Goldman Sachs with over five years experience in quality management, as a contractor to perform the responsibilities of Quality Assurance Manager.[17] *JM Aff. ¶ 28; JS Aff. Ex. 21.*

78. Mr. Young began working on or about January 23, 2002. *JM Aff. ¶ 28.*

79. In Mr. McKenna's opinion, Mr. Young was more qualified than Plaintiff for the Quality Assurance role. *JM Aff. ¶ 33, 34.*

80. Less than one month later, Mr. Young left the account and Mr. McKenna resumed the interview process. *JM Aff. ¶ 30.*

81. After conducting more interviews, Mr. McKenna selected Jacqueline Walpole for the Quality Assurance position on or about March 12, 2002. *JM Aff. ¶ 31.*

82. Ms. Walpole had the requisite quality assurance background as she was the former Director of Quality Assurance at Barnes & Noble with nearly three years experience and quality management and had experience creating a Quality Assurance Department.[18] *JS Aff. Ex. 22; JM Aff. ¶ 32.*

83. Plaintiff, in contrast, did not have a Quality Assurance background. *JM Dep., p. 94.*

84. In Mr. McKenna's opinion, Ms. Walpole was better qualified than Plaintiff for the Quality Assurance role. *JM Dep., p. 24-25, 62, 94; JM Aff. ¶ 33, 34.*

85. In fact, Plaintiff never requested a promotion of any kind. *Pl. Dep., p. 268.*

---

[17] Mr. Young is a Caucasian male. *JM Aff. ¶ 29.* A copy of Barry Young's resume is attached to the JS Aff. as Exhibit 21.

[18] A copy of Jacqueline Walpole's resume is attached to the JS Aff. as Exhibit 22.

86. After working as a contractor for six months, Ms. Walpole was offered regular employment with Unisys in the role of Business Excellence Manager (with the responsibilities of a "Quality Assurance Manager"). *Pl. Dep., p. 263-64; JW Dep., p. 19, 22.*

87. Ms. Walpole accepted the position and became a regular Unisys employee effective September 9, 2002.[19] *JS Aff. Ex. 23.*

88. She was hired at a salary of $96,468 which was less than the MRP for her role. *Id.*

89. In January 2003, Ms. Walpole took maternity leave. *JM Aff. ¶ 35.*

90. Jai Maxwell, an employee of Unisys' Enterprise Transformation Services business unit, was temporarily assigned to the Port Authority account to assist with various projects.[20] *AC Aff. ¶ 31,32; JS Aff. Ex. 25.*

91. Mr. Maxwell assumed Ms. Walpole's duties as Quality Assurance Manager while she was on maternity leave.[21] *JM Aff. ¶ 24.*

92. Mr. Maxwell was not a member of the PMO or even of Global Infrastructure Services, and he did not transfer to a position on the Port Authority project as Plaintiff did. *KN Aff. ¶ 10; JS Aff. Ex. 25.*

93. His supervisor, Eugenia K. Tsentas, continued to be responsible for his performance evaluations, salary increases and promotions. *KN Aff. ¶ 11; JS Aff. Ex. 24.*

94. During his deployment to the Port Authority, Mr. Maxwell also completed an assessment regarding the system administrators which was initially assigned to Ms. Walpole. *JW Dep., p. 30-31.*

---

[19] A copy of Ms. Walpole's Employee Transaction History Detail is attached to the JS Aff. as Exhibit 23.

[20] Jai Maxwell is a Caucasian male. *JM Aff. ¶ 37.* A copy of Mr. Maxwell's Employee Transaction History Detail is attached to the JS Aff. as Exhibit 25.

[21] A copy of Jai Maxwell's 2002 performance review is attached to the JS Aff. as Exhibit 24.

### 2. The Service Delivery Project Management Manager 2 Position.

95. In early 2002, Unisys began getting bigger projects which incorporated tasks in the contract. *AC Aff. ¶ 38; AK Aff. ¶ 19; JM Aff. ¶ 21.*

96. As a result more systems analysts were hired. *AC Aff. ¶ 38; JM Aff. ¶ 21.*

97. In January 2002, Robb Napolitano interviewed for the Quality Assurance Manager position. *RN Dep., p. 22-23; JM Aff. ¶ 39; AK Aff. ¶ 20.*

98. Mr. Napolitano had several years experience in desktop applications project management, image building, application distribution, and systems administration.[22] *RN Dep., p. 5, 25, 51; JS Aff. Ex. 26.*

99. Messrs. McKenna and Schwartz were impressed with his qualifications, but thought he was better suited for system administration functions. *JM Aff. ¶ 40; AK Aff. ¶ 21.*

100. Mr. Napolitano began working on the Port Authority account in February 2002 as a contractor assisting on various projects. *RN Dep., p. 3-4; JM Aff. ¶ 41; AK Aff. ¶ 22.*

101. While Plaintiff was on maternity leave, Mr. Napolitano was assigned work order requests, a task which Plaintiff had been handling for no more than six months. *JM Aff. ¶ 42.*

102. Mr. Napolitano continued to be responsible for work order requests throughout his tenure at the Port Authority. *RN Dep., p. 38.*

103. His responsibilities later changed to include work order invoicing and coordinating the computer lab/deployment area. *JM Dep., p. 78.*

104. In September 2003, as a result of Mr. Campea's organizational restructuring, Mr. Napolitano began reporting to Mr. Schwartz instead of Mr. McKenna. *AS Aff. ¶ 25.*

---

[22] A copy of Robb Napolitano's resume is attached to the JS Aff. as Exhibit 26.

105. In early 2004, Unisys announced a cost savings initiative involving converting eligible contractors to Unisys employees. *JM Dep., p. 70; AC Aff. ¶ 26.*

106. By that time work orders and other projects had increased and the management of the work became a billable position. *AS Aff. ¶ 26; AC Aff. ¶ 27.*

107. For these reasons, a Unisys position on the Port Authority Account, Service Delivery Project Manager 2, was created for the purpose of converting Mr. Napolitano from a contractor to an employee.[23] *AS Aff. ¶ 27; AC Aff. ¶ 28; JS Aff. Ex. 27.*

108. Mr. Schwartz recommended Mr. Napolitano for the position based on his prior management experience, contractor status and impressive job performance during his tenure on the Port Authority account. *AS Aff. ¶ 28, 30.*

109. Mr. Napolitano was offered regular employment with Unisys in the position of Service Delivery Project Management Manager 2 performing the same duties he was responsible for as a contractor. *AS Aff. ¶ 29; JS Aff. Ex. 27.*

110. By the time he was hired as a Unisys employee, he had been working on the Port Authority account for over two years. *AS Aff. ¶ 30; AC Aff. ¶ 29.*

111. Mr. Napolitano accepted the position and became a regular Unisys employee effective June 30, 2004. [24] *JS Aff. Ex. 28.*

112. Plaintiff was not considered for this position because she was already a regular Unisys employee, and unlike Mr. Napolitano, had not been performing the duties of the position for over two years. *AS Aff. ¶ 31; AC Aff. ¶ 30.*

113. In Mr. Schwartz's opinion, Mr. Napolitano was more qualified than Plaintiff for the Service Delivery Project Manager role. *AS Aff. ¶ 30.*

---

[23] A copy of the job requisition for Service Delivery Project Management Manager 2 is attached to the JS Aff. as Exhibit 27.

[24] A copy of Mr. Napolitano's Employee Transaction History Detail is attached to the JS Aff. as Exhibit 28.

114. Mr. Napolitano was hired at a salary of $95,004, an amount slightly higher than the MRP for his role. *JS Aff. Ex. 28.*

115. He did not receive a salary increase during his tenure as a Unisys employee. *RN Dep., p. 26, 28, 30; JS Aff. Ex. 28.*

E. **Facts Relating to Plaintiff's Voluntary Resignation.**

116. At sometime prior to her resignation of employment, Plaintiff copied the contents of her work computer onto two CDs, deleted all of the files on her work computer, and removed the only record of Unisys' work product on her computer. *Pl. Dep., p. 25.*

117. She did this even though she knew the information on the computer was essential to the functioning of her job and was the property of Unisys. *Pl. Dep., p. 25-26.*

118. Plaintiff was not authorized to remove, retain or destroy this data. *AC Aff. ¶ 38; JM Aff. ¶ 56; KN Aff. ¶ 23.*

119. Plaintiff did so in violation of her fiduciary obligations to Unisys, the Unisys Discipline policy, and the Employee Proprietary Information, Invention and Non-Competition Agreement she signed at the outset of her employment with Defendant.[25] *KN Aff. ¶ 24; JS Aff. Exs. 29 and 30.*

120. The Employee Proprietary Information, Invention and Non-Competition Agreement which Plaintiff signed, specifically provides the following:

---

[25] Copies of the Unisys Discipline policy and the Employee Proprietary Information, Invention and Non-Competition Agreement are attached to the JS Aff. as Exhibits 29 and 30.

> I acknowledge that, during my employment with Unisys Corporation, I shall be in a position of confidence and trust, and shall have access to various data, developments, improvements, processes, tools, customer relationships, personnel information and other trade secrets and/or confidential information relating to the business of Unisys.
>
> **….** I will not, except when authorized by the Company, remove any Company-controlled property Company premises. I will return to the Company, immediately upon my termination of employment or upon my transfer within the Company, all Company-controlled property in my possession or control. *JS Aff. Ex. 30.*

121. Unisys' Disciplinary policy specifically provides for disciplinary action, up to and including discharge for "removing or misappropriation of any property, record or document of the Company, or the property of others without management authorization." *JS Aff. Ex. 29.*

122. If Defendant had known that Plaintiff had taken its property and destroyed the contents of her work computer, Defendant have terminated Plaintiff's employment immediately. *KN Aff. ¶ 26; AC Aff. ¶ 39; JM Aff. ¶ 57.*

123. Plaintiff left her badge, laptop, identification, keys and corporate credit card with Maureen Brown, the Administrative Assistant, at the end of the workday on Friday, September 10, 2004. *JM Aff. ¶ 51.*

124. Before business hours on the following Monday morning, September 13, 2004, Plaintiff left a voice-mail for Mr. McKenna stating that she resigned from her position.[26] *Pl. Dep., p. 305; JM Aff. ¶ 45; JS Aff. Ex. 31.*

125. Plaintiff did not give prior notice of her resignation to her supervisor or any other Unisys manager. *Pl. Dep., p. 315; AC Aff. ¶ 34; JM Aff. ¶46.*

126. During her deposition, Plaintiff stated that she resigned because she felt insulted and discriminated against because of her race and compensation. *Pl. Dep., p. 306-07.*

---

[26] A copy of Mr. McKenna's notes regarding Plaintiff's resignation is attached to the JS Aff. as Exhibit 31.

127. According to Plaintiff, "the straw that broke the camel's back is when Mr. McKenna asked [Plaintiff] to take over an application for Jacqueline Walpole." *Pl. Dep., p. 246 - 248.*

128. Plaintiff felt she was being treated differently than Jacqueline Walpole. *Pl. Dep., p. 246 -248.*

129. Plaintiff decided to resign upon consultation with an attorney. *Pl. Dep., p. 246 -248.*

130. When Mr. McKenna received Plaintiff's voice-mail regarding her resignation, he immediately telephoned her and left a message advising her that he would not move forward with her resignation if she needed time to rethink her decision. *JS Aff. Ex. 31; JM Aff. ¶ 47.*

131. Mr. McKenna also telephone Plaintiff's cell phone, Plaintiff answered the phone and stated they should not talk and hung up the phone. *JS Aff. Ex. 31; JM Aff. ¶ 49, 50.*

132. When Mr. McKenna advised Mr. Campea of Plaintiff's resignation, Mr. Campea also telephoned Plaintiff and left a message asking her to call him so they could resolve whatever was bothering her. *Pl. Dep., p. 306; AC Aff. ¶ 35.*

133. The next day, Mr. McKenna telephoned Plaintiff again and left another message asking Plaintiff to contact HR or the Employee Relations Assist line. *JS Aff. Ex. 31; JM Aff. ¶ 53.*

134. Although Plaintiff was aware of Unisys' anti-discrimination policy, she admits that she did not complain to Human Resources, the Employee & Labor Relations group or anyone else at Unisys about her allegations of race discrimination. *Pl. Dep., p. 245-46, 254, 296.*

135. Plaintiff was aware she could speak to a representative in the Employee & Labor Relations group if she was uncomfortable speaking with her supervisor or Human Resources regarding her concerns. *Pl. Dep., p. 295-98.*

136. Plaintiff previously had participated in an investigation of sex discrimination conducted by the Employee and Labor Relations group, and found it to be a positive experience. *Pl. Dep., p. 295-98.*

137. Plaintiff did not make any effort to utilize any Unisys' complaint procedure or policy to resolve her concerns regarding her employment prior to her resignation. *Pl. Dep., p. 245-46, 254, 296; KN Aff. ¶ 21.*

138. Plaintiff did not inform her managers of her allegations of race discrimination during her tenure as a Unisys employee. *AC Aff. ¶ 40; JM Aff. ¶ 58.*

139. Unisys was not aware of Plaintiff's allegations of race discrimination until receipt of a letter from Plaintiff's attorney on September 15, 2004.[27] *KN Aff. ¶ 20; JS Aff. Ex. 32.*

F.   **The Alleged Bases For Plaintiff's Claims.**

140. Plaintiff alleges that she was discriminated against based on her race in violation of § 1981, N.Y. Exec. Law § 296, and the N.Y.C. Admin. Code § 8-502. Specifically, Plaintiff's Complaint sets forth five claims alleging differential treatment based on race. Counts I and V, allege that she should have been promoted to Quality Assurance Manager in March 2002 or Extra Work Project Manager in June 2004 (C*omplaint ¶1-3, 16-19).* Count III alleges that she was denied a promotion because of her role code in 2003 (*Complaint ¶ 9, 10, 11, 12).* Counts II and IV allege that her management responsibilities were diminished in August 2002, 2003 and 2004 (*Complaint ¶ 4-8, 13-15).*

---

[27] A copy of the correspondence from Elizabeth Mason to Joe Teklits is attached to the JS Aff. as Exhibit 32.

                                  Respectfully submitted,

                                  JACKSON LEWIS LLP
                                  One North Broadway
                                  15th Floor
                                  White Plains, New York 10601
                                  (914) 328-0404
                                  (914) 328-1882 Facsimile

Dated:    August 25, 2006        By:    s/ Joseph A. Saccomano, Jr.
            New York, New York               Joseph A. Saccomano, Jr., Esq. (JS 7504)

                                  Nicole Quick Saldana, Esq. (NS 6524)
                                  JACKSON LEWIS LLP
                                  59 Maiden Lane
                                  New York, New York 10038-4502
                                  (212) 545-4000
                                  (212) 972-3213 Facsimile

                                  Alan Kintisch, Esq. (Admitted pro hac vice)
                                  UNISYS CORPORATION
                                  Township Line & Union Meeting Roads
                                  P.O. Box 500
                                  Blue Bell, Pennsylvania 19424-0001

                                  ATTORNEYS FOR DEFENDANT
                                  UNISYS CORPORATION